

NUMBER 13-17-00006-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ROSA MENDEZ,                                                                          Appellant,

v.

JAVIER SALINAS AND ANTARA
TRUCKING, L.L.C.,                                                                     Appellees.

## On appeal from the 398th District Court
## of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Contreras and Benavides**
**Memorandum Opinion by Justice Contreras**

Appellant, Rosa Mendez, was injured in a vehicular accident and sued appellees

Javier Salinas and Antara Trucking, L.L.C. (Antara).  Following a trial, the jury found no

liability on the part of either appellee, and the trial court rendered a take-nothing judgment.

On appeal, Mendez contends that the trial court should have granted her motion for new

trial because (1) defense counsel made improper comments relating to Mendez's ethnicity and immigration status, and (2) the evidence was factually insufficient to support the jury's findings. We reverse and remand.

## I. BACKGROUND

The subject accident occurred before dawn on December 2, 2013, on westbound Interstate 10 in Harris County. Mendez alleged in her live petition that Salinas, an Hidalgo County resident, negligently made an unsafe lane change while driving a tractor-trailer as an employee of Antara, striking Mendez's vehicle and causing her to suffer injuries.

Prior to trial, Mendez filed a "Motion to Exclude Evidence Regarding Plaintiff's Immigration Status," noting that appellees had designated a private investigator to testify that Mendez "is not qualified to earn wages legally in the United States." At a pre-trial hearing, the trial court granted the motion and instructed defense counsel to "make no statement, offer no evidence or propose any testimony concerning [Mendez]'s immigration standing."

Trial evidence established that the collision occurred when Salinas attempted to change lanes and struck the left side of Mendez's car. Salinas, who was called as an adverse witness at trial by Mendez's counsel, testified through an interpreter that when the accident happened, he "felt the impact" and "saw that a car was braking, and then I stopped." He said that he and Mendez then pulled over to the side of the highway, and Mendez told him that she was "fine." He stated that no ambulance came and he observed Mendez drive away.

Salinas agreed that, in a deposition taken a year prior to trial, he testified that he had apologized to Mendez and admitted his fault to her immediately after the accident.

2

He acknowledged that, in his deposition testimony, he stated that he made an unsafe lane change and was "100 percent to blame." At trial, Salinas conceded that he apologized to Mendez but denied admitting that he was at fault for the accident. When asked to explain why he changed his testimony from his deposition, Salinas stated that he "now understand[s] how the accident happened" and he "realized that [Mendez] was overtaking me from the right" but was in his blind spot. He speculated that Mendez was speeding, noting that "if I'm driving at 60 and I look into my rearview mirror and I see nobody, and then I start changing my lane, and I—and I—and all of a sudden she's there, she's obviously going faster than I am." He agreed, however, that he admitted at the deposition that it is his job to determine if there is a car in his blind spot before he changes lanes. He further agreed that, if Mendez had attempted to pass him on the left instead of the right, the accident would not have happened.

On cross-examination, appellees' counsel asked Salinas whether he was an American citizen. He replied that he is and that he first came to the United States in 1997.

Mendez testified through an interpreter that, though she understands English, she is more comfortable expressing herself in Spanish. She stated that, at the time of the accident, she was on her way to work, which was to start at 6:00 a.m. She stated she was not running late, and she was driving under the speed limit in the right-middle lane of the four-lane freeway. She stated: "I saw that the trailer was next to me, [and] since I don't like being next to the trailers . . . I was ready to come ahead of him when I felt the impact, when he hit me. . . . He switched lanes into my lane and hit me." She later clarified that she was "a little bit ahead of" Salinas when she decided to pull away from him. Mendez testified that the impact caused her car to be "thrown to the right" and that

3

she had to swerve back to the left to avoid hitting a car in the right-most lane. She stated that Salinas continued to drive forward and she had to honk at him to get him to pull over. According to Mendez, Salinas told her and the police at the scene that he was at fault, that he had not seen her car, and that he did not turn to look in that direction.

During cross-examination of Mendez, appellees' counsel noted that, according to a police report, the time of the accident was 5:50 a.m., and counsel asked: "So if that crash time is correct, there is no way you could made it to work on time by 6:00 unless you were speeding; isn't that true?" Mendez replied that the collision actually occurred between 5:25 and 5:30, and that after she called the police, it took about 25 to 30 minutes for an officer to arrive. Appellees' counsel further observed that, according to the police report, the call reporting the accident was received by police at 6:05 a.m. and an officer arrived at the scene at 6:08 a.m. Mendez did not know if the officer "got it wrong or not"; she stated that "whatever he stated there, that is something that he is the only one that can tell you about, not me." She reiterated her testimony that it took almost a half an hour for an officer to arrive after she called the police. She further acknowledged that she previously stated at a deposition that the accident occurred between 5:20 and 6:00 a.m.

Appellees' counsel additionally noted that, according to the police report, Mendez's car was in the far right lane, not the right-middle lane, as Mendez had testified. Mendez stated that she had always told the officer that she was in the right-middle lane. The police report indicated that no one was injured as a result of the accident, and Mendez conceded that she told the officer that she was not injured. Mendez also conceded that she had been in a prior accident in 2007 in which her car was totaled.

Mendez testified that she quit her job at a secondhand clothing store in 2015 due

4

to the pain she was suffering as a result of the 2013 accident. She has undergone surgery to alleviate her pain and, though she "felt very well for about seven or eight months" after the procedure, the pain returned, and her only option now is additional surgery as recommended by Zoran Cupic, M.D., an orthopedic surgeon.

Cupic testified that Mendez has disc protrusions in her upper and lower back which cause pain. He stated that the disc protrusions were, to a reasonable degree of medical probability, the result of trauma she suffered in the accident, because imaging showed no indication of any age-related degeneration. Because treatments including anti-inflammatory medication, physical therapy, and steroid injections were not effective, Cupic stated that laminectomy, discectomy, and fusion surgery would be necessary. He stated that lumbar fusion surgery customarily costs around $100,000, while cervical fusion surgery customarily costs around $80,000.

At the beginning of the penultimate day of trial, appellees' counsel asked to confer with the court outside the presence of the jury in regard to a dispute between the attorneys that occurred the previous day, during which Mendez's counsel suggested that appellees' counsel was "lying" to the jury by redacting certain information from an exhibit. The trial court stated: "Go ahead and ask for a mistrial. I'll grant it, I promise." Appellees' counsel did not ask for a mistrial but instead asked the trial court to instruct the jury that Mendez's counsel acted improperly and that they are not to infer any wrongdoing on the part of appellees' counsel. The trial court initially denied the instruction, at which point appellees' counsel asked for a mistrial. Subsequently, following a lengthy exchange concerning whether Mendez's counsel had actually used the word "lie" in his earlier remarks, the trial court reconsidered her ruling and granted the jury instruction.

5

The jury found that the negligence of Salinas and Mendez, if any, did not cause the injuries in question, and appellees moved for judgment on the verdict. Mendez filed a motion for new trial arguing that appellees "improperly inserted evidence and argument concerning [Mendez]'s immigration status" and that the jury's finding of no negligence on the part of Salinas was against the overwhelming weight of the evidence. After a hearing, the trial court denied the motion for new trial and rendered a take-nothing judgment in favor of appellees. This appeal followed.

## II. DISCUSSION

A trial court may grant a motion for new trial upon good cause shown. TEX. R. CIV. P. 320. We review a ruling on a motion for new trial for abuse of discretion. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Crawford v. XTO Energy, Inc.*, 509 S.W.3d 906, 911 (Tex. 2017).

By her first issue, Mendez argues that the trial court erred in denying her motion for new trial on grounds that appellees' counsel made improper and prejudicial comments on Mendez's ethnicity and immigration status.

## A.     Remarks

First, Mendez points to the following exchange that took place when, during cross-examination, appellees' counsel invited Cupic to review a form that Mendez had filled out during an office visit:

Q.     And now she's got pain at a 10 plus, and she's telling you that—go up, please. She's got pain and pressure in the back, correct?

A.     Okay. Again, I don't look at those because those are only for the medication. I hope I'm clear on that.

Q.     And this appears to be in her own words, correct?

6

A. I guess so. I don't know.

Q. I mean, your office staff, they don't write it in Spanish, do they?

A. My office may have done it, but you're asking me. I wasn't there when that happened.

No objection was made to the question or the response. Mendez argues on appeal that the question regarding whether the form was in Spanish was an improper veiled reference to her ethnicity.

Second, Mendez points to a question asked by appellees' counsel during cross-examination of Angelo Romagosa, M.D., a physician specializing in physical medicine and rehabilitation. Romagosa testified that he was retained by Mendez's counsel's law firm to review medical records, examine Mendez, and give an opinion about her future medical needs or "life care plan." After asking several questions about whether Mendez had been married, appellees' counsel asked: "And your opinions assume that Ms. Mendez is going to continue living in the United States, right?" Romagosa replied, "Yes." At that point, Mendez's counsel asked for a bench conference, and a discussion was had off the record. Subsequently, the jury was excused from the courtroom and the following conversation ensued:

[Mendez's counsel]: Just to recap where we were, Your Honor, we approached and talked to you off the record about how I believe the defendant was trying to mistry this case by injecting—improperly injecting the plaintiff's immigration status into this case, and I think your comment was you understood the reference, but you weren't accusing them of intentionally doing anything, but you understood the clear reference, and the defendants disagreed they were doing anything improper or trying to interject immigration status into the case but thought it was a necessary part of their presentation.

Is that a fair summary of what we're doing?

7

[Appellees' counsel]: The question did not involve immigration. The plaintiff can voluntarily decide to move back to Mexico and—or her home country. It was solely whether or not she continues living in the United States. There was nothing about immigration in that question.

[Mendez's counsel]: It was pretty clear what skunk they were trying to throw into the jury box I think to everybody in this courtroom.

[Mendez's counsel]: I think the Court also noted that that was not the first time that the indirect reference was being made, and—and I think that's—that's something that the Court should consider in any motion that we—we might make here after consideration.

[Appellees' counsel]: I don't know what the other indirect reference is.

[Appellees' counsel]: Or even in front of a jury.

THE COURT: Two times.

[Mendez's counsel]: It's been—we've been trying to not draw attention to it, and there was the thing you were saying to Dr. Cupic and saying, Oh, Dr. Cupic, can you read Spanish, you know, and there are all these things that—

[Appellees' counsel]: I think you're sensitive.

[Appellees' counsel]: There are lots of records in Spanish that you're going to see.

[Mendez's counsel]: We didn't complain about it, we didn't object, but this is something that's really improper at this point.

[Appellees' counsel]: Your Honor, what's manifestly wrong with this whole scenario is that she has no work permit here in this country, and they're defrauding the Court when they come forward here and she has falsified records, made it impossible for us to do background checks on her because of three different social security numbers that she's stolen from other people, and they are trying to make a wage claim

8

when they could have dropped it, but instead they insist on going forward with it.[1]

A person from a foreign country has an accident here, they have every right to be here, but they don't have a work permit. Obviously, that is admissible to show that the standard used by the economic— the economic expert should be where she lives and not where the accident occurred.

If a person is from Honduras, you're not going to do earnings capacity if they only have a right to work in Honduras.

[Mendez's counsel]: Fortunately, the Courts have—

THE COURT: And she may be one of the thousands of people that have been here in the United States for so many, many years that are probably going to be seeking some path to legalization sometime soon, and, as much as—I don't know whose social security numbers she was using. I don't know if those people's social security numbers are relatives or friends that have given her permission to use it, whether rightfully or wrongfully. I don't know. You know, I don't know any of those facts other than what I know from the case and the evidence as presented, but we all know what the United States Constitution says with regards to citizenship and even what the case law says.

[Appellees' counsel]: And we're not bringing it up.

THE COURT: You should not be bringing it up. And all I'm interested in doing is trying this case as fairly as we can, but if you're going to try to interject and going— trying to elbow in and do kind of stuff, well I have no choice if motions are made.

None of them are being made right now. You made one a while back for a mistrial.

[Appellees' counsel]: Right.

---

[1] Mendez was later asked, outside the presence of the jury, whether she is legally permitted to work in the United States or whether she used other persons' social security numbers in order to do so. On her attorney's advice, she declined to answer and invoked her Fifth Amendment right not to testify.

THE COURT:    And if you want a mistrial and will agree to a mistrial, we'll grant a mistrial.

Mendez's attorneys did not ask for an instruction to disregard, nor did they move for mistrial. However, after the jury returned its verdict, Mendez moved for a new trial arguing in part that appellees' counsel "improperly injected [her] immigration status into the case."

## B.    Applicable Law

Ordinarily, appellate complaints of improper jury argument must be preserved by timely objection and request for an instruction that the jury disregard the improper remark. TEX. R. APP. P. 33.1; *see Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839–41 (Tex. 1979). However, certain improper arguments may be so extreme that a "juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) (citing *Goforth v. Alvey*, 271 S.W.2d 404, 404 (Tex. 1954)). In such cases, the argument is considered incurable by an instruction to disregard, and the issue may be asserted and preserved in a motion for new trial, even without a complaint and ruling during the trial. *See id.* (citing TEX. R. CIV. P. 324(b)(5)). The reasoning is that "counsel making the argument is the offender so the law will not require opposing counsel to take a chance on prejudicing his cause with the jury by making the objection." *Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex. 1968) (citing *Smerke v. Office Equip. Co.*, 158 S.W.2d 302 (Tex. 1941)).

Incurable jury argument is rare because "[t]ypically, retraction of the argument or instruction from the court can cure any probable harm." *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam). "But jury argument that strikes at the appearance of and the actual impartiality, equality, and fairness of justice rendered

10

by courts is incurably harmful not only because of its harm to the litigants involved, but also because of its capacity to damage the judicial system." *Id.* at 681. Examples of such incurably improper arguments including appeals to racial prejudice and unsupported, extreme personal attacks on opposing parties and witnesses. *Id.*

Appeals to racial and ethnic prejudice "adversely affect the fairness and equality of justice rendered by courts because they improperly induce consideration of a party's race to be used as a factor in the jury's decision." *Id.*; *see Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 874–75 (Tex. 2008) ("[W]hen issues like race, religion, gender, and wealth are injected into a case unnecessarily, there is the potential for damage not just to a litigant but to the civil justice system. Courts must provide equal justice to all, regardless of their circumstances, and efforts to suggest that jurors should do otherwise cannot be lightly disregarded."). Therefore, such appeals are considered incurable by jury instruction. *Reese*, 584 S.W.2d at 840; *Tex. Emps. Ins. Ass'n v. Haywood*, 266 S.W.2d 856 (Tex. 1954).

## C. Analysis

Mendez did not ask for an instruction to disregard or move for mistrial at the time the challenged comments were made. Accordingly, she is entitled to a new trial only if the comments were incurably prejudicial.[2] *See Penalver*, 256 S.W.3d at 681.

---

[2] Appellees contend on appeal that Mendez waived the issue by failing to request a jury instruction or a mistrial when the allegedly prejudicial comments were made. *See* TEX. R. APP. P. 33.1(a). But as noted, a complaint regarding an incurably prejudicial argument may be made for the first time in a motion for new trial. *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). Appellees also contend that Mendez waived the issue because her counsel opposed appellees' motion for mistrial on the penultimate day of trial. But the grounds for mistrial alleged by appellees' counsel at that point were wholly unrelated to the grounds raised by Mendez in her motion for new trial and on appeal. Her issue, therefore, has not been waived.

11

First, we find that appellees' counsel's question to Cupic as to whether his office documentation was available in Spanish was not by itself prejudicial. Mendez's counsel mentioned in his opening argument at trial that English is not Mendez's first language and that she prefers to communicate in Spanish, and Mendez herself confirmed that in her trial testimony. The trial court's pre-trial order did not prohibit the attorneys from asking questions about Mendez's preferred language—it only prohibited questions regarding her immigration status. Further, it is noteworthy that both Mendez and Salinas testified at trial through interpreters. Therefore, although references to a party's native language may be prejudicial in certain circumstances, we find it unlikely that appellees' counsel sought to sway the jury on that basis by asking this particular question in this case.

On the other hand, the question posed by appellees' counsel to Romagosa—regarding whether his opinions assumed Mendez would continue to live in the United States—is highly problematic. Romagosa's testimony principally concerned the nature and cost of Mendez's future medical needs. He testified briefly regarding Mendez's future need for vocational training, but he did not otherwise address her earning capacity or employment prospects. The question posed by appellees' counsel was arguably relevant to the issue of how much Mendez's future treatments and medications would cost, since she would only be entitled to those expenses that are customary in the place where she lives. Further, appellees argue that the question was relevant as to Mendez's claim for future lost wages, since she would only be entitled to compensation if she were legally able to work in the place where she lives. But, as Mendez notes, a plaintiff need not show citizenship or the possession of immigration work authorization permits as a prerequisite to recover damages for lost earning capacity under Texas law. *See Tyson Foods, Inc. v.*

*Guzman*, 116 S.W.3d 233, 247 (Tex. App.—Tyler 2003, no pet.). In any event, in light of the court's pre-trial order, it is difficult to understand counsel's question as anything other than a veiled reference to Mendez's status as an undocumented immigrant. The question is whether this reference so prejudiced the jury as to amount to an incurable error.

Mendez cites *TXI Transportation Corp. v. Hughes*, another truck accident case, in which the Texas Supreme Court held the trial court erred by admitting evidence of the defendant's immigration status. 306 S.W.3d 230, 242–43 (Tex. 2010). The evidence included testimony showing that the defendant was an undocumented immigrant, had used a false social security number, had falsely affirmed in his employment application that he had the right to work in the United States, and had previously been deported. *Id.* at 243. The Court found that plaintiff's counsel's "repeated injection into the case of [the defendant's] nationality, ethnicity, and illegal-immigrant status, including his conviction and deportation, was plainly calculated to inflame the jury against him" and was therefore more prejudicial than probative. *Id.* at 244 (applying TEX. R. EVID. 403).

At oral argument, Mendez's counsel argued that this case is "almost identical" to *Hughes*. But the cases are different in two crucial respects. In *Hughes*, the trial court permitted the attorney to continue to refer to the defendant's immigration status on over forty occasions, *see* 306 S.W.3d at 243, whereas here, the trial court was aware of the inflammatory nature of such remarks and ruled prior to trial that they would not be permitted. As a result, Mendez's immigration status was explicitly referenced before the jury only once throughout the entire trial. Second, the questions presented in *Hughes* were (1) whether the trial court abused its discretion in determining that the probative value of evidence concerning defendant's immigration status outweighed its prejudicial

13

potential, and (2) whether that error probably caused the rendition of an improper judgment. *See id.* at 242 (citing TEX. R. EVID. 403, TEX. R. APP. P. 44.1). Those questions are related, but not identical, to the question presented here, which is whether a single veiled reference to immigration status constitutes an error so prejudicial that it could not be cured by a jury instruction. *See Penalver*, 256 S.W.3d at 681.

Even so, Mendez contends that a single remark oriented toward a party's immigration status can cause incurable harm.[3] In *Texas Employers' Insurance Ass'n v. Guerrero*, the San Antonio Court of Appeals ordered a new trial where plaintiff's counsel stated as follows in his closing argument:

> I am tickled to death to be here and I will represent him and any man like him in Zavala, Maverick, Dimmit, Cameron, any county in the State of Texas any time.
>
> Octavio Paz, a well-known author said one time, and I will quote him and I already translated it. He said, "Things that unite us far exceed those things that divide us."
>
> You apply that to evidence. The things, the preponderance of the evidence, that unite in favor of Mr. Guerrero, far exceed those inconsistencies, the legal problems. He is not a perfect man, neither is his medical. But heck, he went back to work after he got cut, things of this nature. The things that unite us, exceed those that divide us. There is a time to be united. Right now is a time to be united.
>
> An example is politics. We don't have to agree with all the candidates, with the same ones. But by golly there comes a time when we have got to stick together as a community. We have to stick together as a jury of peers of a man to pass judgment and help that person if he is entitled to [sic] under the evidence . . . .
>
> Because if one is united, one has hope. And with hope, one can live. He still has a lot of years to live. And it is all going to depend on you.

---

[3] The trial court seemed to indicate that an "indirect reference" to Mendez's immigration status had been made twice prior to the question at issue. However, the parties do not direct us to any point in the record where any such indirect reference was made in front of the jury, and we find none.

14

800 S.W.2d 859, 862 (Tex. App.—San Antonio 1990, writ denied). The court rejected the plaintiff's contention on appeal that the argument was merely "a request that the jury view Guerrero's case as more united by consistencies than divided by legal technicalities." *Id.* Noting that eleven of the twelve jurors had Spanish surnames, the court instead found that the argument was a "forbidden ethnic plea" and was incurable. *Id.* at 866. The court emphasized that it does not make a difference whether the improper reference is brazen or subtle:

> The law should not stoop to evaluating subtle distinctions such as whether an argument was too crude and revolting, or on the other hand sufficiently slick and artful to pass muster. To permit the sophisticated ethnic plea while condemning those that are open and unabashed would simply reward counsel for ingenuity in packaging. Inevitably, lawyers representing their clients zealously within the bounds of the law would test the limits and fine-tune their arguments to avoid being too explicit. Courts would be asked to label some arguments permissible and uphold them with a wink when everyone knew that an ethnic appeal had been made. That course would demean the law and perhaps deepen the divisions from which society already suffers.

*Id.* at 865. Instead, "incurable reversible error occurs whenever any attorney suggests, either openly or with subtlety and finesse, that a jury feel solidarity with or animus toward a litigant or a witness because of race or ethnicity." *Id.* at 866.

*Guerrero* demonstrates that a single racially or ethnically prejudicial remark, whether implicit or explicit, may give rise to incurable error.[4] And "the probative value of evidence concerning a plaintiff's illegal immigrant status is low, while the prejudicial effect

---

[4] Mendez also cites *Penate v. Berry*, a 1961 case in which the El Paso Court of Civil Appeals reversed for a new trial where the defendant's counsel stated in closing: "[Y]ou see, it just so happens that in this country you can't come into court and reach your hands into the pockets of an American citizen and take his property from him—not for an alien—they may take away . . . ." 348 S.W.2d 167, 168 (Tex. Civ. App.—El Paso 1961, writ ref'd n.r.e.). But the El Paso court explained that the foregoing statement was merely the "most inflammatory" of "numerous remarks" made by defendant's counsel which were "directed to the citizenship of [the plaintiff]." *Id.* Therefore, the case does not support Mendez's assertion that a single prejudicial remark can result in incurable error.

15

of this evidence is high." *Republic Waste Servs., Ltd. v. Martinez*, 335 S.W.3d 401, 409 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see Hughes*, 306 S.W.3d at 244 (citing TEX. R. EVID. 403). Under the circumstances of this case, we agree with Mendez that appellees' counsel's veiled reference to her immigration status was so prejudicial as to be incurable by an instruction to disregard. We reach this conclusion after considering the entire record, including appellees' counsel's comments at the bench conference following the challenged question, which strongly indicate that counsel believed, contrary to the trial court's pre-trial ruling, that evidence of Mendez's immigration status was relevant and admissible.

Because appellees' counsel's question was incurably prejudicial, the trial court abused its discretion by denying Mendez's motion for new trial. We sustain Mendez's first issue on appeal.[5]

## III. CONCLUSION

The trial court's judgment is reversed, and the cause is remanded for a new trial consistent with this opinion.

DORI CONTRERAS
Justice

Delivered and filed the
14th day of June, 2018.

---

[5] In light of our conclusion, we need not address Mendez's second issue, by which she argues that the evidence was factually insufficient to support the jury's finding of no liability. *See* TEX. R. APP. P. 47.1.