**AFFIRM; and Opinion Filed April 18, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-16-01209-CV

**THAD F. BAKER AND 3900 COMMERCE 1996, LTD., Appellants**
**V.**
**THOMAS HABEEB, TOMMY HABEEB ENTERPRISES, INC. AND ATVD, LLC,**
**Appellees**

**On Appeal from the 192nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-10940**

## MEMORANDUM OPINION

Before Justices Lang, Brown, and Whitehill
Opinion by Justice Brown

Appellants Thad F. Baker and 3900 Commerce 1996, Ltd. appeal a final judgment granted

in favor of appellees Thomas Habeeb, Tommy Habeeb Enterprises, Inc. and ATVD, LLC.  In three

issues, appellants argue (1) the trial court abused its discretion in allowing appellees' expert Paul

Rich to testify as to the future value of master tapes for episodes of two television shows, (2) the

evidence was insufficient to support the jury's award of damages, and (3) the trial court erred in

submitting a negligence claim to the jury.  For the following reasons, we affirm the trial court's

final judgment.

BACKGROUND

Habeeb has worked in the entertainment industry as a television actor, producer, and writer

for approximately 35 years.  He owns Tommy Habeeb Enterprises, Inc., which develops and

produces content for network and syndicated television shows, and ATVD, LLC, which distributes, or licenses, content. Beginning in January 2013, Habeeb took over production on several projects and began working in a commercial building at 620 Exposition Avenue in Dallas, Texas, where the production was ongoing. The building was owned by 3900 Commerce. Following a default on the lease in July 2013, Habeeb and Jim Campbell, owner of one of the projects in development, negotiated with Baker, 3900 Commerce's managing partner, to remain in the building through production.

Production of Campbell's project wrapped up in December 2013, but Habeeb still had need for office space. He attempted to negotiate with Baker to remain at 620 Exposition, but they never entered into a written lease. Instead, they entered into an oral arrangement for Habeeb to pay $1,000 per month for January and February 2014 and thereafter vacate the premises. The parties disputed the exact area in the building contemplated by their oral arrangement; Baker believed it covered some office space only, but Habeeb testified that it covered a larger area including a storage room where he was keeping raw footage and master tapes of television programming. The storage room was locked with a deadbolt, and a note on its door read, "Do Not Touch."

In anticipation of Habeeb vacating by the end of February 2014, Baker planned to clean and renovate the space to prepare for new tenants. Baker testified that he thought a lot of the property in the area where Habeeb officed belonged to the prior tenant and told Habeeb, "[w]herever your stuff is, make sure you put it some place where we won't haul it off." According to Habeeb, he moved some items in the kitchen area, where there was a leak and they "were doing electrical work and things like that."

On February 17, 2014, 3900 Commerce maintenance workers removed items from the storage room, which they accessed through the room's back wall, and an adjacent hallway. Baker had instructed the crew to throw away trash, but retain any items that appeared to be valuable and

move those to a nearby warehouse. One of the maintenance workers, Ernesto Aleman, testified to throwing some materials into a dumpster, but also taking forty to fifty fifty-five-gallon trash bags with all sizes of "movie" tapes from shelving in the storage room to the off-site warehouse.

Scott Ricamore, a freelance television producer working for Habeeb, went to retrieve a master tape from the storage room later that day and discovered the room had been mostly emptied. Ricamore notified Habeeb, and they retrieved some property from a dumpster. Habeeb contacted the Dallas Police Department to report the missing property and tried to contact Baker. The next day, Aleman returned the tapes from the warehouse at the direction of Baker's son-in-law. According to Habeeb, however, master tapes for forty-six half-hour episodes of the television show *Stag: A Test of Love* (*Stag*) and seven one-hour episodes of the television show *Billionaire Car Club* (*BCC*), along with some equipment, financial records, and memorabilia, were never located or returned.

Habeeb sued Baker, alleging the loss of the property and asserting claims for negligence, breach of warranty, breach of the oral lease agreement, and conversion. At trial, Habeeb explained that he had made seventy-two episodes of *Stag*, a reality show filming bachelor and bachelorette parties and the parties' aftermaths. The average cost to make an episode of Stag is about $75,000. Broadcast versions of *Stag* aired domestically on ABC, NBC, CBS, FOX and the CW networks and in fifty to sixty other countries. Uncensored versions of the same episodes were sold to the iN DEMAND network. Habeeb had not received a new order for *Stag* during the three years prior to trial, but it was airing on iN DEMAND at the time of trial. *BCC*, a magazine format show profiling car collectors, also was broadcast both in domestic and foreign markets. According to Habeeb, it would cost about $60,000 to reshoot an episode of *BCC*. He believed there was a market for both the *Stag* and *BCC* programming.

Appellees designated Paul Rich as an expert to testify on the value of the missing tapes. Rich is the owner and CEO of BoPaul Media Worldwide, a corporation specializing in global distribution of film and television programming. Rich has experience valuing and selling entire libraries of film and television shows and has consulted for banks and international media companies in evaluations, mergers, and acquisitions. He has distributed and marketed television and film programming since 1973 and reality, or non-scripted, programming specifically since 2000. Indeed, Rich distributed both *Stag* and/or *BCC* from approximately 2005 to 2009 or 2010.

An "Asset Valuation" report prepared by BoPaul Media was admitted into evidence. The report concludes the total discounted value of the library of missing *Stag* and *BCC* episodes was $4,847,000. BoPaul Media valued the missing episodes as if they were to be continued in distribution worldwide as they had been for the previous ten years, primarily broadcast in syndication domestically and on national television channels and DVD/VOD outlets in more than eighty countries. BoPaul Media used three cycles of distribution: (1) a first repeat cycle, a cycle of three years of repeats of a show after its original run; (2) a second repeat cycle of three years; and (3) a third cycle of perpetuity representing the show's remaining life. The report included a table showing the estimated value of each episode over the three cycles and across free and paid television, video/DVD, internet, new media, and non-theatrical rights sales in twenty-nine territories beginning from the second quarter of 2015. BoPaul Media then discounted the library's value by deductions of fifteen percent allocated for internal rate of return,[1] twenty percent for net present value,[2] and twenty percent for return on investment.[3]

---

[1] Rich defined internal rate of return as an "interest rate giving a net present value of zero when applied to the expected cash flow of a project. Its value, compared to the cost of the capital involved, is used to determine the project's viability."

[2] Rich defined net present value as "an assessment of the long-term profitability of the TV series made by adding together all the revenue it can be expected to achieve over its whole life and deducting all the costs involved, discounting both future costs and revenue at an appropriate rate NPV."

[3] Rich defined return on investment as "the amount of profit, before tax and after depreciation, from an investment made, usually expressed as a percentage of the original total cost invested." Rich's report states a ROI discount of twenty-two percent, but the amount he applied in his calculation was twenty percent.

BoPaul Media used an asset approach as one method for valuation, relying upon the economic principle of substitution, seeking to estimate the costs of recreating an asset of equal value to that being replaced. It also used the economic principle of competition by consulting the marketplace and studying sales by similar businesses, including BoPaul Media, to estimate the value in comparison to similar businesses whose assets' values had been recently established by the market. The report states that "virtually all of the estimates are based on unpublished but reliable, anecdotal industry information gathered by BoPaul Media through its global network of buyers and sellers of licensed media rights." The valuation was based on Mr. Rich's forty years' experience in licensing a similar product "throughout the world, market pricing predicated on BoPaul Media's current and most recent sales, and estimated value on pricing of similar content from known competitors in the field over the past 12 months." The assessment also took into account overall marketplace conditions, trends, and fiscal outlook going forward.

During his trial testimony, Rich explained that individuals active in the sales of programming usually perform valuations of television and film libraries because they have the information at hand and experience working with it. He also expanded on the underlying information he considered to prepare the valuation. He reviewed (1) past distributions of the shows reflected in license agreements (specifically, seven *Stag* agreements and seventeen *BCC* agreements); (2) distributions of approximately 100 hours of similar programming for the same audience on like channels reflected in rights and sales that BoPaul Media previously distributed; and (3) "anecdotal information." Rich testified that, because the terms of television licensing agreements are not published or otherwise public knowledge, anecdotal information that he has picked up through his experience in the business is very important for these types of evaluations. He has obtained information from hundreds of buyers at television stations and competitors around the world. According to Rich, it is standard methodology in the industry to use all three items –

actual historical sales, information about the sales of similar shows, and experience-based anecdotal information – for a valuation.

Appellants' expert, George Cavelli, is an accountant who has spent most of his 30-year career in the entertainment field. He primarily audits, or performs royalty and participation examinations of, motion picture or record distributors and valuations. Cavelli looked at the same *Stag* and *BCC* licensing agreements that Rich reviewed and, using Rich's three-cycle and discounting formulas, estimated the future earnings for the missing episodes was $160,000. He did not take any comparable sales into account for his valuation. He testified that he typically looks at historical data to see how a particular property performed in the past to estimate future earnings, or asset value. Cavelli would look to performance of other properties if no historical information is available. And, to a certain extent, he would look at anecdotal evidence, or the type of evidence "just from being in the industry" like film reviews and observable public perceptions, but noted that it is hard to quantify. Cavelli examined Rich's report and concluded that there was no basis for Rich's estimated future revenues.

Following trial, the jury found appellants liable for negligence and assessed damages of $2,582,854.60. It also found appellants liable for conversion and breach of the oral lease, assessing damages at $500. Appellants moved for judgment notwithstanding the verdict, which the trial court denied. Instead, the trial court entered a final judgment awarding the damages of $2,582,854.60 for recovery on the negligence claim, but disregarding the jury's verdict on the conversion and breach of contract claims. Appellants appeal from the trial court's final judgment.

EXPERT TESTIMONY

In their first issue, appellants contend the trial court abused its discretion in allowing Rich to testify on the value of the missing episodes of *Stag* and *BCC*. Appellants argue both Rich lacked qualification to testify and his opinions were unreliable.

The trial court is the "evidentiary gatekeeper" responsible for excluding irrelevant and unreliable expert evidence. *Exxon Pipeline Co v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). It has broad discretion to determine the admissibility of evidence, and we will reverse only for an abuse of that discretion. *Id.* A trial court abuses its discretion if it acts without reference to any guiding rules and principles. *E.I du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

An expert's testimony is admissible if the expert is qualified to testify about "scientific, technical, or other specialized knowledge" and the testimony is relevant and based upon a reliable foundation. TEX. R. EVID. 702; *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 234 (Tex. 2010); *Zwahr*, 88 S.W.3d at 628. If an expert's testimony is based on unreliable data or if the expert draws conclusions from his underlying data based on a flawed methodology, the testimony is unreliable. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)).

In *Robinson*, the supreme court suggested six factors courts may consider to assess reliability: (1) the extent to which the expert's theory has been or can be tested; (2) the extent to which the technique relies on the expert's subjective interpretation; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential rate of error; (5) whether the relevant scientific community has accepted as valued the underlying theory or technique generally; and (6) the nonjudicial uses made of the theory or technique. *Robinson*, 923 S.W.2d at 549, 557. The supreme court, however, has emphasized that these factors are non-exclusive and do not fit every scenario. *See, e.g., Hughes*, 306 S.W.3d at 235; *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 725-26 (Tex. 1998)). Rather than focus entirely on the reliability of an expert's technique, it may be appropriate in some cases "to analyze whether the expert's opinion actually fits the facts of the case." *See Hughes*, 306 S.W.3d at 235; *Helena*

*Chemical Co. v. Wilkins*, 47 S.W.3d 486, 499-501 (Tex. 2001). To do so, the trial court must determine whether there are any significant analytical gaps in the expert opinion that undermine its reliability. *Hughes*, 306 S.W.3d at 235; *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 642 (Tex. 2009) (expert must show how the data relied upon is valid support for the opinion). Additionally, an opinion based only on subjective belief or unsupported speculation is unreliable. *Hughes*, 306 S.W.3d at 239. The court's ultimate task, however, is not to determine whether an expert's conclusions are correct, but rather whether the expert's analysis in reaching those conclusions is reliable. *Zwahr*, 88 S.W.3d at 629 (citing *Gammill*, 972 S.W.2d at 728); *Robinson*, 923 S.W.2d at 558 ("The trial court's role is not to determine the truth or falsity of the expert's opinion.").

At the outset, we address appellees' contention appellants failed to preserve their challenge to Rich's expert testimony because they did not re-urge their objection during Rich's trial testimony. Appellants filed a motion to exclude Rich's testimony prior to deposing him. The trial court denied the motion. Appellants then filed a motion to reconsider after deposing Rich. At the hearing, appellants referred to some of Rich's deposition testimony in urging their objection, and appellees introduced Rich's file into evidence. At the close of the hearing, the trial court announced it was not going to strike Rich, but would defer ruling, hear Rich's testimony, and rule accordingly at the time of trial. At the outset of trial, appellants again requested the trial court to reconsider its ruling on the motion to exclude. In response, the trial court stated, "I'm going to overrule or deny your Motion for Reconsideration." To preserve a complaint that expert evidence is unreliable, a party must object to the evidence before trial or when the evidence is offered. *See Maritime Overseas Corp. v Ellis*, 971 S.W.3d 402, 409 (Tex. 1998). Because appellants raised their objection to Rich's testifying as an expert both before trial and again at the outset of trial and the trial court denied their motion, we conclude they adequately preserved error for this appeal.

Appellants acknowledge Rich's expertise in television programming sales but contend that, unlike accounting or finance, his experience does not convey the specialized knowledge required to opine on the value of the lost episodes. We disagree. Rich has worked as a television and film distributor and marketer since 1973. He has sold and licensed television programming around the world since 1996 and reality, or non-scripted, television programming since 2000. Rich testified to his belief that, other than cable television channels, his company sells more men's lifestyle programming than any other company. He also has experience valuing and selling entire libraries of films and television shows, and people in the industry have used him and his methodology to facilitate such valuations. We conclude that Rich had specific experience on the subject matter of this lawsuit, and his knowledge, skill, experience, and training in selling and licensing the very type of product at issue in this lawsuit qualify him to offer an opinion on appellees' damages. *See* TEX. R. EVID. 702.

Appellants next contend that Rich's testimony is unreliable because his methodology is flawed and there is too great an analytical gap between his asset valuation and the underlying data upon which he relied. As support, appellants complain Rich (1) misinterpreted or ignored historical sales data; (2) relied on dissimilar programming as a comparison; and (3) improperly relied on subjective, unquantifiable "anecdotal information."

Appellants complain Rich's opinion ignored, cherry-picked, or misrepresented the data he reviewed. First, appellants argue Rich assigned much higher valuations for the missing episodes than the proceeds from historical licensing agreements for *Stag* and *BCC* episodes that he reviewed. Appellants direct us to a licensing agreement with FOXTEL in Australia charging $778 for an hour of *Stag* from August 2007 through July 2009. The asset valuation report, however, assigned a value of $10,000 for the first-repeat cycle of a *Stag* episode in Australia/New Zealand. Appellants also refer to a 2007 United Kingdom licensing agreement charging $10,000 plus thirty

percent royalty for fifteen episodes of *Stag*, but the asset valuation report assigns a first-repeat cycle value of $5,000 per episode. To explain the difference in values, Rich testified that consideration had to be given to the rights being sold and the applicable time period of the agreements. For example, the FOXTEL agreement was only for a limited subscription service license in Australia for the FOX subscription channel. Rich also considered the many other channels and outlets, like home video and the internet, that were not reflected in the FOXTEL agreement. Rich also relied on data showing another distributor, Shine International, had $28,095 in gross receipts for *Stag* in Australia for a period from October 2010 to December 2010. In addition, Habeeb had informed Rich that Australia was a good territory for his programming with average value in the range of $13,000 per hour. Finally, Rich applied the fifty-five percent discount to all of the projections shown in the report, reducing the $10,000 projection for Australia//New Zealand and the $5000 projection for the United Kingdom by more than half.

Appellants also complain Rich rendered an opinion as to future value of the episodes in twenty-nine different territories, despite a lack of demand for *Stag* during the three years preceding trial and after reviewing licensing agreements pertaining to only four territories for *Stag* and sixteen territories for *BCC*. Habeeb did testify that he had not sold *Stag* in a foreign market during the three years preceding trial, but the show was airing at the time of trial on iN DEMAND and had aired in upwards of fifty or sixty different countries. Moreover, with the master tapes of forty-six episodes missing for more than two of the three years preceding trial, the inventory available to license was very substantially reduced. Although appellants' brief recites that Rich reviewed only five *Stag* agreements (Canada, the United Kingdom, Australia, the Middle East, and the Philippines), which provided data for four territories, the record also contains an agreement for France and data showing *Stag* was sold in Russia, New Zealand, and India and had aired in well over a hundred domestic broadcast and cable markets.

Appellants also cite a large discrepancy between $778 per hour for *Stag* and $3000 per hour for *Bikini Destination* in the FOXTEL Australia agreement as evidence that Rich relied upon dissimilar shows in arriving at his opinion. But licensing rates for each show reflected in the different agreements were not static. For example, another agreement with MTV in Finland licensed new episodes of Bikini Destination for $600 and renewals for $300. Indeed, it would take someone with Rich's expertise in the field to understand the significance of the difference in the licensing rates from agreement to agreement and country to country. Rich described reviewing sales of approximately 100 hours of similar programming for the same audience on like channels. He looked not only at sales of *Bikini Destination*, but also specifically identified *The Extremist* and *Man's 7 Show* as similar shows geared toward a male audience and the record includes sales data for those shows as well. We do not think a single discrepancy between one licensing rate for *Stag* and another for *Bikini Destination* in a single agreement renders Rich's opinion or his consideration of like programming unreliable.

Nor do we think the evidence shows that Rich either ignored or misinterpreted the available historical data. Unlike Cavelli, Rich did not make his valuation by simply plugging the licensing rates from the historical agreements into his three-cycle formula and applying the discounts. Instead, as he explained, he used the historical sales, sales histories of other like programming, and other information he had access to through his experience in the business to formulate the valuation.

Appellants next argue Rich's reliance on anecdotal information renders his methodology and opinions fatally flawed. Appellants specifically direct us to Rich's response when asked whether there is a piece of paper or somewhere to look for the numbers he used, apply a formula, and reach the same conclusion: "No, because I can't – I can't put down all of the factors that went into the third piece, for example, anecdotal. I can't give you all that information. It's

impossible. I would have to wire my brain and pass it on to you." Rich, however, also testified the "anecdotal information" he relied upon included unpublished information related to sales of similar programming that he learned from other television programming buyers and sellers. According to Rich, the information was not a guess, but reflected factual events that happened to be unpublished. He further testified to consideration of marketplace trends, including the "explosion" of new media, including many new channels and internet outlets, providing a destination for American-produced reality television programming and the fact that American shows remained popular in foreign markets even though those countries were creating some of their own programming. That Rich did not have written evidence to support each bit of information he relied upon should not disqualify him from offering an opinion in his field. His experience, along with the other information he relied upon, is a proper basis for his testimony. *See Gammill*, 972 S.W.2d at 726 ("Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case.").

We also disagree with appellants' general argument that Rich's methodology fails because he did not explain how or why the prior sales of *Stag* or *BCC* episodes, sales of similar programming, or the "anecdotal information" Rich relied upon were actual indicators of the future value of the missing episodes. Appellants' expert Cavelli, applying Rich's three-cycle formula and discounts, also used prior sales of the shows as the basis for his valuation opinion, testifying that he estimated future earnings based on past performance. Although Cavelli did not consider any comparable data in reaching his opinion in this case, he testified that he would look to performance of other programming and, to a certain extent, anecdotal evidence "just from being in the industry" if there is no historical information available. And, pre-existing profits, along with other facts and circumstances, is an accepted method of estimating lost profits. *See Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).

Ultimately, appellants' complaints reflect a disagreement with Rich's consideration of any factors other than the actual prior sales reflected in the historical licensing agreements. But, the fact that Cavelli testified to a contrary methodology is not proof that Rich's methodology is flawed. *See CBS Outdoor, Inc. v. Potter*, No. 01-11-00650, 2013 WL 269091, at * 14-15 (Tex. App.—Houston [1st Dist.] Jan. 24, 2013, pet. denied) (mem. op.). The disagreement did not establish that Rich's testimony was patently subjective; it simply raised a conflict in the evidence, and resolution of that conflict was a matter for the jury. *Id.*

This is not a case of an expert simply laying out his credentials and then offering only a subjective opinion. *See Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 878 (Tex. 2014). Rich's testimony established that he had expertise in valuing television programming libraries. He undertook a quantitative analysis of information used to make the asset valuation, and the record contains the asset valuation report and over a hundred pages of related documents that Rich reviewed, all of which was admitted into evidence without objection. According to Rich, he used a standard methodology in the industry for the valuation by examining three sources of information – actual historical sales, information about the sales of similar shows, and experience-based anecdotal information. That Rich did not testify to the specific data underlying his calculation of each projection does not constitute a significant analytical gap rendering his testimony unreliable. The trial court's role was not to determine whether each of Rich's projections as to the value of an episode in a particular territory was correct; it was to determine only if the analysis he used to reach his conclusions was reliable. *See Gammill*, 972 S.W2d at 728; *Zwahr*, 88 S.W.3d at 629. We conclude Rich's expert testimony fits the unusual facts of this case and the trial court did not abuse its discretion in finding Rich's methodology and testimony reliable and, thus, admissible. *See Hughes*, 306 S.W.3d at 239. Accordingly, we overrule appellants' first issue.

In their second issue, appellants contend appellees did not establish the value of the missing tapes in reasonable certainty. Specifically, appellants contend Cavelli's testimony was the only reliable evidence of damages and Rich's testimony, appellees' only evidence of lost profits, was legally insufficient to support the verdict.

An appellant attacking the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof must demonstrate that no evidence supports the finding. *See Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 839 (Tex. App.—Dallas 2012, no pet.); *Exel Transp. Servs., Inc. v. Aim High Logistics Servs., LLC*, 323 S.W.3d 224, 232 (Tex. App.—Dallas 2010, pet. denied). We review the evidence presented at trial in the light most favorable to the jury's verdict, crediting all favorable evidence jurors could believe and disregarding all contrary evidence unless reasonable jurors could not. *See Exel Transp. Servs.*, 323 S.W.3d at 232. Anything more than a scintilla of evidence is legally sufficient to support the jury's finding. *Id.*

Plaintiffs may recover lost profits as damages if the loss is the natural and probable consequence of the act or omission complained of and the amount of the loss is shown with reasonable certainty. *Texas Instruments*, 877 S.W.2d at 279 (quoting *Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097, 1098-99 (Tex. 1938)). "Reasonable certainty" in the proof of lost profits is a fact-intensive determination and "is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Texas Instruments*, 877 S.W.2d at 279; *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). Reasonable certainty cannot be established when profits are largely speculative; for example, profits "from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and

unproven enterprise, cannot be recovered." *Texas Instruments*, 877 S.W.2d at 279. "The focus is on the experience of the persons involved in the enterprise and the nature of the business activity, and the relevant market." *Id.* at 280. Lost profits need not be susceptible to exact calculation, but estimates must be based on objective facts, figures, or data from which the amount may be ascertained. *Helena Chem. Co.*, 47 S.W.3d at 504; *Holt Atherton*, 835 S.W.2d at 84. Pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. *Texas Instruments*, 877 S.W.2d at 279. There is no particular rule or method for measuring lost profits, but once a party chooses a method, it must provide one complete calculation under that method. *Holt Atherton*, 835 S.W.2d at 85.

Fair market value is the proper measure of damages for the loss of personal property. *See Saulsberry v. Ross*, 485 S.W.3d 35, 51 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). Fair market value is generally determined either by using comparable market sales, calculating replacement costs less depreciation, or capitalizing net income (profits). *Phillips v. Carlton Energy Group, LLC,* 475 S.W.3d 265, 278 (Tex. 2015). The reasonable certainty of proof requirement also applies when lost profits are used to determine the market value of property for which recovery is sought. *Id.* Yet, "when evidence of potential profits is used to prove the market value of an income-producing asset, the law should not require greater certainty in projecting those profits than the market itself would." *Id.*

A jury is free to accept or reject all or any portion of an expert's testimony it does not find credible. *See McGailliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (jury has considerable discretion in evaluating opinion testimony from an expert on the amount of damages); *Kirkpatrick v. Memorial Hosp. of Garland*, 862 S.W.2d 762, 772 (Tex. App.—Dallas 1993, writ denied). The jury also has discretion to award damages within the range of evidence presented at trial, so long as there is a rational basis for calculation. *See, e.g., Basic Capital Mgmt., Inc. v. Dynex*

–15–

*Commercial, Inc.*, 402 S.W.3d 257, 265 (Tex. App.—Dallas 2013, pet. denied). The jury's finding may not be set aside because its reasoning in arriving at the amount of damages is unclear. *Examination Mgmt. Servs.,* 367 S.W.3d at 844.

Appellants contend Rich's testimony constitutes no evidence of lost profits due to the deficiencies they alleged rendered it unreliable and, even if his testimony was reliable, those same deficiencies preclude appellees from showing lost profits with reasonable certainty because his opinion is not based on objective facts, figures, or data. However, the evidence shows that, both before and after the loss of the master tapes, there was an established domestic and foreign market for men's reality-based lifestyle television programming, and both *Stag* and *BCC* specifically. Habeeb had years of experience in producing programming content, and Rich had years of experience distributing and valuing programming. This is not a case of a new or unproven enterprise, an untested product into unknown or unviable markets, chancy business opportunities or dependency on uncertain or changing market conditions.

Using only some historical sales of *Stag* and *BCC* episodes as his underlying data, Cavelli adopted Rich's single calculation using the three-cycle formula and discounts to estimate future earnings of $160,000. Rich considered additional data he gathered from forty years' experience in licensing the same and similar shows, including the current and most recent sales of similar content by his company and known competitors in the field, as well as market conditions and trends. Although appellants criticize Rich for using the additional data and not showing how he used that data to arrive at his opinion, there is no requirement that Rich's opinion be exact or that he produce documents supporting his opinion and estimates. *See Holt Atherton*, 835 S.W.2d at 84 (failure to produce documents supporting an opinion or estimate of lost profits goes only to weight of the evidence). Further, historical profits, together with the other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. *Helena Chem.*

–16–

*Co.*, 47 S.W.3d at 505; *Texas Instruments*, 877 S.W.2d at 279.  We conclude Rich's estimate was based on objective facts, figures, and data such that the amount of lost profits due to the missing *Stag* and *BCC* episodes could be ascertained.

Appellants also argue that Rich's projections are not net lost profits.  Lost profits are damages for the loss of net income – income from the lost business activity less expenses that would have been attributable to that activity.  *Examination Mgmt. Servs.*, 367 S.W.3d at 840. Appellants claim Rich's projections reflect only gross sales and ignore costs and overhead associated with the shows, but his calculation included a discount of twenty percent of the library's value for return on investment, which represented these costs.  Appellants have a burden to provide at least some evidence that appellees' otherwise complete loss profit calculation was inadequate due to missing expense, but do not direct us to any specific expenses that were not deducted as return on investment.  *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.2d 867, 879 (Tex. 2010) ("It is not necessarily the case that a company will incur increased expense or overhead, especially if the company is already profitable at the time the damage began and evidence supports an inference that it could have performed profitable services using only its existing resources.").

Moreover, appellants brought all of the deficiencies they alleged in Rich's opinion to the jury's attention.  *See ERI Consulting Eng'rs*, 318 S.W.2d at 876 (the amount of damages, including lost profits, is a fact question for the jury).  Appellants' objections to Rich's testimony regarding lost profits go to the credibility or the weight to be given to this evidence by the jury.  *See generally Ledesma*, 242 S.W.3d at 40-41 (concluding complaints about expert testimony went to the weight of such testimony when the testimony did not present too great an analytical gap between the data and the opinion, and the expert's testimony did not amount to anything more than a recitation of his credentials and a subjective opinion).  Both parties made their argument to the jury, and the jury found damages of $2,582,856.60, which was within a range

of the projections supported by the evidence. While it is not clear how the jury arrived at this figure, it had the discretion to award damages within the range of the evidence presented at trial. *Howell Crude Oil Co., v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 108 (Tex. App.—Houston [14th Dist.] 1996, writ denied). Cavelli's testimony combined with appellants' cross-examination of Rich could have lead the jury to reasonably conclude a lesser award was more appropriate. We may not set aside the jury's finding because its reasoning in reaching its finding is unclear. *Examination Mgmt. Servs.,* 367 S.W.3d at 844. Viewing all of the evidence in the light most favorable to the trial court's award of damages and disregarding any contrary evidence because a reasonable factfinder could, we conclude the jury's damages award was within the range of evidence presented and is supported by more than a scintilla of evidence to establish damages with reasonable certainty. *See Helena Chemical Co.*, 47 S.W.3d at 506. Accordingly, we overrule appellants' second issue.

NEGLIGENCE

In their third issue, appellants argue the trial court erred in submitting appellees' negligence claim to the jury. Specifically, appellants claim they owed no duty to appellees other than under the oral lease agreement and, because appellants' conduct in throwing away and removing personal property was intentional, submission of a negligence question was improper and, thus, cannot support a negligence finding.

A trial court must submit jury questions raised by the written pleadings and the evidence. *See* TEX. R. CIV. P. 278. The trial court has broad discretion in submitting a question as long as the question fairly places the disputed issue before the jury. *Rosell v. Central Western Motor Stages, Inc.*, 89 S.W.3d 643, 653 (Tex. App.—Dallas 2002, pet denied). We review a trial court's submission of questions under an abuse of discretion standard. *Id*. Reversal is warranted if the trial court denies a proper submission of a valid theory of recovery raised by the pleadings and

–18–

evidence. *Id.* Otherwise, we reverse only if harm results and, for harm to result, the error must probably cause the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1); *Rosell*, 789 S.W.3d at 653.

In Texas, the elements of actionable negligence are a legal duty owed by one person to another, a breach of that duty, and damages proximately resulting from that breach. *See Western Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). Whether a defendant owed a legal duty to a plaintiff is a question of law for the trial court to decide from the particular facts surrounding the occurrence in question, *Military Highway Water Supply Corp. v. Morin*, 156 S.W.3d 569, 572 (Tex. 2005); whether a defendant breached a duty is a question of fact. *Caldwell v. Curioni*, 125 S.W.3d 784, 793 (Tex. App.—Dallas 2004, pet. denied). Texas law recognizes several duties on the part of landlords with respect to premises turned over to tenants. *See Shell Oil Co. v. Khan*, 138 S.W.3d 288, 297 (Tex. 2004). One of those duties is to use ordinary care in making repairs in the event a landlord undertakes to repair a tenant-controlled area. *Id*. (citing *Flynn v. Pan American Hotel Co.*, 183 S.W.2d 446, 448 (Tex. 1944)); *Blancett v. Lagniappe Ventures, Inc.*, 177 S.W.3d 584, 590 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Here, appellees' third amended petition alleges that appellants owed appellees, as paying tenants, a duty to use ordinary care to perform any repairs or work on the premises in a reasonable manner, including in a manner that would not injure appellees' personal property. Appellants breached this duty, and the breach was the proximate cause of damage to appellees. The evidence at trial shows that, during the term of the oral lease arrangement, appellants planned and executed a cleanup in space occupied by appellees in order to redesign the space for future lessees. 3900 Commerce maintenance workers removed appellees' items from the locked storage room by entering through the room's rear wall. The workers threw some of the materials into a dumpster and transported forty to fifty fifty-five-gallon trash bags with all sizes of "movie" tapes to the

warehouse. Although appellees were able to retrieve some items from the dumpster and tapes were returned from the warehouse, other items, including *Stag* and *BCC* master tapes, remained missing. After the close of evidence, the jury responded "yes" to the charge question, "Did the negligence, if any, of [appellants] proximately cause the occurrence in question?"

After examining the particular facts surrounding appellants' activity, we conclude the trial court correctly determined that appellants, as a landlord entering leased premises and undertaking to clean the area for a redesign, had a duty to appellees as a matter of law. Further, there was sufficient evidence of a breach of that duty in the conduct of 3900 Commerce workers throwing away some of appellees' property and removing other property offsite to fairly place the issue before the jury. Reviewing the written pleadings and the evidence, we conclude the trial court did not abuse its discretion in submitting the jury question on negligence. *See* TEX. R. CIV. P. 278; *Rosell*, 789 S.W.3d at 653.

Additionally, we disagree with appellants' position that, because the property damage was the result of Baker's intentional instructions to "throw out or otherwise carry away and store Habeeb's property," there can be no evidence supporting a negligent act. A negligence claim differs from an intentional tort not in whether the defendant intended the action, but whether he intended the resulting injury. *See Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985); *Gavrel v. Lieberman*, No. 2-08-414-CV, 2010 WL 1270334, at *2 (Tex. App.—Fort Worth Apr. 1, 2010, no pet.) (mem. op.). Here, there is no evidence that Baker or anyone else at 3900 Commerce intended to harm appellees in the cleanup; indeed, Baker testified that he thought the

property belonged to a previous tenant, not Habeeb.  Accordingly, we overrule appellants' third issue.

We affirm the trial court's final judgment.

/Ada Brown/
ADA BROWN
JUSTICE

161209F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

THAD F. BAKER AND 3900
COMMERCE 1996, LTD., Appellants

No. 05-16-01209-CV     V.

THOMAS HABEEB, TOMMY HABEEB
ENTERPRISES, INC. AND ATVD, LLC,
Appellees

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-10940.
Opinion delivered by Justice Brown;
Justices Lang and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellees THOMAS HABEEB, TOMMY HABEEB
ENTERPRISES, INC. AND ATVD, LLC recover their costs of this appeal from appellants
THAD F. BAKER AND 3900 COMMERCE 1996, LTD.

Judgment entered this 18th day of April, 2018.