

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00335-CV

_____

IN THE INTEREST OF Z.S., CHILD

---

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. 17-2885-158

---

Before Kerr, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

Mother appeals the trial court's order terminating her parental rights to her child Zane.[1] She raises two issues on appeal: (1) expert testimony about her drug-testing results is conclusory, unreliable, and legally insufficient; and (2) the evidence is legally and factually insufficient to show that termination is in Zane's best interest. We affirm.

## I.  Background

Mother, who moved to Texas from Wisconsin, has a history of involvement with the Texas Department of Family and Protective Services, in part because of her drug abuse and in part because of an abusive relationship with her children's father,[2] who is also a drug user. The Department removed two of Zane's older siblings—Rachel and Danny—from Mother's care before Zane was born because Danny had tested positive for drugs at birth. Mother admits she was using drugs during this time. She also tested positive for drugs after Danny's birth while pregnant with Zane; Mother denied using drugs then but has no explanation for the positive results.

---

[1]We use pseudonyms to refer to all children. *See* Tex. R. App. P. 9.8(b).

[2]Mother denied Father's paternity of Zane's older siblings although he has been identified as their alleged father; she did not deny that he is Zane's father.

By April 2017, Zane was eleven months old and living with Mother,[3] and the Department had returned Rachel and Danny to Mother on a monitored return. At a Department and CASA visit with Mother and all three children, the caseworker noticed that Danny had a burn on his face. Mother explained that Danny had tried to drink boiling water that he had pulled off the counter where Mother had placed it to make tea. Mother was not in the room at the time. Mother told the caseworker that the burn had occurred the week before, on a Sunday; that the burn merely looked red that night, so she put some Neosporin on it; that the burn had "bubbled up" by the next morning; but that Mother had waited until after Rachel was finished with school that day before taking Danny to the emergency room because she had no one else to pick up Rachel from school and take care of her.[4] The caseworker found out later that the emergency room had Danny transported by ambulance to Parkland for treatment and that Danny had developed a throat infection as a result of the burn.

The Department removed all three children from Mother's care and drug tested Mother and the children. All four, including Zane, tested positive for cocaine. The Department also discovered that Mother had been allowing Father's parents to have possession of Zane at least once per week even though they were prohibited from having access to Rachel and Danny in the monitored return.

---

[3]Although Mother tested positive for drugs after Danny's removal and before Zane's birth, the drug test of Zane's meconium at birth was negative.

[4]Rachel was four years old in April 2017.

The trial court rendered temporary orders appointing the Department Zane's temporary managing conservator and ordering Mother to be drug and alcohol tested. Mother signed a service plan agreeing, among other things, (1) to submit to random drug testing, (2) to attend NA/AA meetings five times per week if she had a positive drug test, (3) to attend individual counseling and parenting classes, and (4) to maintain safe, stable, and appropriate housing for at least six months and for the rest of the case thereafter.

While this case was pending, Mother moved for a temporary restraining order and permanent injunction against Father to restrain him from committing family violence against her, Zane, and Zane's siblings. Mother also filed an emergency motion to modify the trial court's temporary orders to remove the restriction that she not be in the presence of any child under sixteen because she had recently given birth to another child, Andy,[5] and the doctor would not release him to her care because of the restriction. The trial court denied the motion, and the Department placed Andy in foster care with Zane.

The Department also moved for a temporary restraining order against Father because he had threatened the caseworkers with violence.

Mother again tested positive for cocaine in December 2017, after Zane's case had been pending about eight months. Nevertheless, Mother once again moved to

---

[5]Father was at the hospital when Andy was born.

4

modify the temporary orders asking to move with Zane and Andy to Wisconsin so that they could all live with her mother (Grandmother) there.

In January 2018, the Department changed its permanency goal to adoption by a relative because Mother had not alleviated the Department's initial concerns and had not fully participated in services. The trial court also permanently enjoined Father from, among other things, committing family violence against Mother or the children, threatening or stalking Mother and the children, or being within 500 yards of any of them.

Also in January 2018, the trial court ruled in Rachel and Danny's case; it terminated Father's rights pursuant to an affidavit of relinquishment, but it did not terminate Mother's rights to the children. Instead, the trial court awarded joint managing conservatorship to Grandmother and Mother, ordered that the two would have possession of the children "at times mutually agreed to in advance" with Mother having no less than four hours of possession per week, and restricted the children's residence to their then-current school district until Mother and Grandmother could "properly and adequately transition the children to" Mother. The trial court also ordered Mother not to "allow any contact between the children and" Father.

The trial court did not remove Zane and Andy from foster care to allow them to move to Wisconsin but increased Mother's weekly visitation to four hours per week—and up to eight hours if Mother chose to move to Wisconsin. Thereafter, she

was to have Skype visitation with the children for fifteen minutes three times per week.

Before the case had been pending a year, the trial court signed an order extending the statutory dismissal date for 180 days. *See* Tex. Fam. Code Ann. § 263.401.

In March 2018, Mother was placed on deferred adjudication community supervision in Texas for felony child endangerment. Thereafter, Mother moved to Wisconsin.

After moving back to Wisconsin, Mother never visited Zane and Andy in Texas; she was not able to find work until June or July 2018. Mother did not initiate her Skype calls with Zane and Andy before at least the end of April 2018, but by August 2018, she was making those calls on a regular basis.

In July 2018, a Department caseworker and the CASA volunteer assigned to the case traveled to Wisconsin for a surprise visit to observe Mother's housing; Mother would not let them inside, went back inside for Rachel and Danny, told the worker and volunteer that she was on her way to the hospital to visit a friend, and left. Although Mother called several hours later to say that the landlord could let them inside, the caseworker and volunteer were already at the airport; they never saw Mother's apartment.

In August 2018, CASA recommended that Mother's rights to Zane be terminated for her lack of progress on her service plan and for her "continued lack of accountability for her role in exposing [her children] to illegal narcotics."

After an October 2018 bench trial, the trial court terminated Mother's and Father's rights to Zane. Father has not appealed.

## II. Standard of Review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in family code section 161.001(b)(1); and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is

contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's finding and do not supplant it with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### III.    Drug-Testing Testimony Legally Sufficient

In Mother's first issue, she challenges the trial court's admission of John Tarver's testimony about the process used to perform her drug tests and the drug-test results, contending that both are conclusory and therefore legally insufficient evidence because the Department did not prove the reliability of the testing techniques under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993). Mother

does not independently challenge the sufficiency of the evidence to prove any of the conduct grounds for termination, presumably because the drug-test results, if valid, support all three conduct-related termination grounds.[6] But she does specifically argue that without the drug-test results, the Department failed to prove the best-interest ground for termination.

## A. Preservation

The State proffered Tarver as "an expert as it pertains to the protocols of the lab, testing[,] and the results of [the] drug testing." Although Mother's counsel objected to the timing of the State's calling Tarver as a witness, Mother did not object generally to Tarver's qualifications,[7] nor did she object to the reliability of Tarver's testimony or the drug-test results at trial. Mother contends on appeal that she did not

---

[6]The trial court terminated Mother's rights on (D), (E), and (P) grounds. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (P). (D) and (E) are common endangerment grounds, *In re D.J.C.*, No. 04-16-00564-CV, 2016 WL 7379248, at *5 (Tex. App.— San Antonio Dec. 21, 2016, no pet.) (mem. op.), and under subsection (P), the Department must prove that the parent "used a controlled substance . . . in a manner that endangered the health or safety of the child, and . . . failed to complete a court-ordered substance abuse treatment program; or . . . after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance." Tex. Fam. Code Ann. § 161.001(b)(1)(P).

[7]Well into Tarver's testimony, Mother objected to one question on qualification grounds: whether Tarver doubted the accuracy of the three test results. Mother objected to "speculation and improper foundation" because Tarver was simply a "custodian of the records." After the State responded that Tarver had already testified that one of his job responsibilities was to review the test results, the trial court overruled the objection. Mother does not complain on appeal about the trial court's ruling on this objection.

9

need to object at trial to complain of the evidence's reliability because it is unreliable on its face.

When a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by an expert, the challenging party must have timely objected at trial to raise the complaint on appeal. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004). But when the party restricts its reliability challenge to the face of the record, "for example, when expert testimony is speculative or conclusory on its face," no objection is necessary to raise the issue on appeal. *Id.* Because Mother contends Tarver's testimony and the drug-test results are conclusory and speculative because they are facially unreliable, we will review her issue. *See id.*

## B. Evidence at Trial

In his opening statement, Mother's counsel told the trial court that the testing results were inadequate to "really prove that she is either ingesting or maintaining a drug addiction problem" and that Mother would swear she had not ingested anything for over two years: "The testing will prove that that's accurate." Mother's explanation for the April 2017 drug-test results was that she was having sex with the children's father, that he was the one using drugs, and that she and the children must have tested positive because they had been around him. Mother also testified that her hair had always grown very slowly.

Tarver testified that he was the lab manager in the employee-services business unit of Quest Diagnostics in Lenexa, Kansas, and was also an "alternate responsible person" for regulated samples. His unit had both federal and state accreditations and would have gone through twelve inspections that year. He at one time had been a diplomate of the American Board of Forensic Toxicology and has been doing drug screens since 1986. He had to complete continuing education every year. Tarver had "been bench tech all the way to technical director to . . . supervisor," and has bachelor's degrees in biology and chemistry, as well as a master's degree in biomedical sciences. At the lab, he was responsible for "everything in the laboratory operations . . . from extraction for a receipt [involving isolating a substance so that it can be tested on the machines] and chain of custodies and extractions." His lab ran "about 30,000 samples a day." Tarver acknowledged that labs have small differences in the way they perform procedures but that they "have to be very close to the same." For instance, labs can use different types of mass spectrometers.

Tarver explained that every day the lab calibrates every batch on an instrument using quality controls of known accurate samples. Although the acceptable range can vary for a quality control, the cutoff decision point for the presence of a substance does not change; for cocaine, the decision point is 300 picograms per milligram.

Tarver testified about three of Mother's hair-strand specimens that the lab tested. He did not prepare all of the samples, but he did complete the final review of them, and he prepared the business-records affidavit for their admission. In his final

review, he looks "to make sure that everything was done properly, that all the chain of custodies were kept, that [the sample's] being reported properly, where it's stored, everything in entirely the whole package."

Tarver testified that the hair strands were screened first to

> make sure that [the sample's] packaged like it's supposed to be. And if it's not, we will reject it at that point. But if it is, it goes on to testing. We -- initially, . . . first, we . . . measure 3.9 centimeters of hair, which would be the closest up to the scalp. So from there out, we do 3.9 centimeters. And then cut that up finer than that. Then we weigh that out, weigh parts of that out to -- so that we can go and take it into a screening procedure.

Before testing the hair, the lab washes it to eliminate substances people put on their hair and environmental exposure because both can interfere with the testing instruments.

After the lab prepares a hair sample, it uses CEDIA, an immunoassay, to test the hair strand, then "[i]f that testing comes back positive . . . , it's only presumptive[ly] positive." The lab does not report that result. If a hair tests presumptively positive, the lab takes another sample of the same hair, washes it, heats it, makes it a gel, and then "extract[s] it into solvents." Then, according to Tarver, "we take those solvents and we dry them down, and then we bring them back up because we concentrated it some doing that, and then we will run them on a mass spectrometer," which "gives us a specific result." The result the lab reports is from the mass spectrometer.

Tarver's lab performed this procedure for all three of Mother's hair samples, which Tarver testified is a standard and accepted practice in the scientific community for testing for cocaine. All of the lab's technicians who performed the tests are properly trained to perform these procedures and receive ongoing and updated training. Tarver did not know of an acceptable rate of error for this type of test because the mass spectrometer gives "a very specific answer, as far as what compound is present." The lab's GC mass spectrometer used for all three tests is, according to Tarver, properly maintained and calibrated.

Mother's and Zane's April 2017 tests were positive for cocaine and benzoylecgonine, a cocaine metabolite,[8] and Mother's November 2017 test was positive for cocaine. Specifically, Mother's April 2017 result contained 13,247 picograms per milligram of cocaine and 829 picograms per milligram of benzoylecgonine, and her November 2017 result contained only 899 picograms per milligram of cocaine. Zane's April 2017 test showed 17,780 picograms per milligram of cocaine and 2,757 picograms per milligram of benzoylecgonine. Tarver did not know if a picogram was a standardized measure for hair tests in other labs.

On cross-examination, Tarver testified that for a cocaine test result to be considered positive, it must also have at least 50 picograms per milligram of

---

[8]Benzoylecgonine is a cocaine metabolite. *State v. Garcia*, No. PD-0344-17, 2018 WL 6521579, at *2 (Tex. Crim. App. Dec. 12, 2018).

benzoylecgonine or another cocaine metabolite.[9] He acknowledged that errors are possible and that since 1985, "[j]ust about everything" in the industry had changed; for example, the technology had improved and different chemicals are used. Tarver acknowledged overhearing "things . . . in the industry that are giving hair results a . . . bad name," but qualified that "[i]t's usually things that are incorrectly . . . described or spoken." According to Tarver, consensus is occurring, but people who do not perform hair testing "say it's problematic and has issues."

Tarver testified that the industry does not agree whether metabolic rates, metabolism, and melanin levels can skew hair-testing results. He had heard that the federal government is who is "considering it most right now to . . . start testing it." He was also aware that "the federal government for much of its work does not actually use the hair strand test and doesn't consider it a viable method." When asked whether the federal government's decision was "based on the experience and experiments that they've run through their scientists or doctors," Tarver responded, "I don't know what you're -- on that. It's ongoing all the time."

Tarver agreed that he does not know about the individual metabolism of the donors in the tested samples. He testified that there is no industry consensus on metabolism's effect on a sample, but he did agree that hair is not homogenous and

[9]Although the November 2017 test results were considered "negative" for benzoylecgonine because it was under the 300 picograms per milligram benchmark, the test results show that 145 picograms per milligram of benzoylecgonine were detected.

that 3.9 centimeters of hair—the amount used for Quest's hair tests—is roughly equivalent to 90 days' growth, based on averages.

Tarver also had read in scientific journals about racial bias or distinction in hair analysis, and he believed it "with reservations." He elaborated, "I want to see enough of the same results out there to bring us to a consensus that that's true."

## C. Analysis

Mother's trial counsel attempted to cast doubt on the reliability of Tarver's testimony and Mother's drug-test results through cross-examination rather than seeking their exclusion. The trial court as the factfinder was solely in the position to determine the credibility of Tarver's testimony. *See J.O.A.*, 283 S.W.3d at 346. And Tarver's testimony was anything but conclusory: he explained the lab's procedures in detail, explained how test results were obtained and objectively interpreted, and reported the objective results obtained for the three tests. Thus, his testimony was not based on merely subjective interpretation. *See TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239–40 (Tex. 2010). Although Mother claims that the evidence shows that Tarver's testimony is unreliable on its face, the reliability of the evidence is, at the most, conflicting; Tarver discounted criticisms of hair testing in general. Because Tarver provided a detailed basis for his testimony, we hold that his testimony and the drug-test results are not conclusory and are, therefore, legally sufficient evidence upon which the trial court could have relied. *See Church v. Exxon Mobil Corp.*, No. 01-11-

15

00802-CV, 2012 WL 5381233, at *5 (Tex. App.—Houston [1st Dist.] Nov. 1, 2012, no pet.) (mem. op.). We overrule Mother's first issue.

## IV. Best Interest

In her second issue, Mother argues that the evidence is both legally and factually insufficient to support a best-interest finding.[10]

### A. Applicable Law

In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. In making our determination, we must employ a strong presumption that keeping a child with a parent serves the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest:

(A) the child's desires;

(B) the child's emotional and physical needs, now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

---

[10]Although Mother asked this court only to render judgment, the remedy for legally insufficient evidence, *Marincasiu v. Drilling*, 441 S.W.3d 551, 562 (Tex. App.— El Paso 2014, pet. denied), she also specifically challenges both the legal and factual sufficiency of the evidence in her brief.

16

(E)      the programs available to assist these individuals to promote the child's best interest;

(F)      the plans for the child by these individuals or by the agency seeking custody;

(G)      the stability of the home or proposed placement;

(H)      the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)      any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Review of Record

Mother contends that the evidence is legally and factually insufficient to prove that termination of the parent–child relationship is in Zane's best interest because the record contains no evidence on the first through third and fifth through seventh *Holley* factors and "scant" evidence of the fourth, eighth, and ninth factors. We disagree that the evidence is as slight as Mother asserts.

17

It is true that Zane is too young to express his desires; he was two years old at the time of trial. Thus, we will review the evidence pertinent to the other factors. Because several witnesses testified regarding multiple factors, we will review the evidence according to the witnesses presented.

## 1. Zane's Caseworker

The caseworker assigned to Zane's case in April 2017 testified that her first task was to visit Mother's home. The home was in good condition, but the caseworker did notice the burn on Danny's face. Mother had not told the Department about the burn even though she had a duty to tell the Department as a condition of Danny and Rachel's monitored return. The caseworker was concerned and alarmed because Mother had failed to report the injury and because the injury was so serious. The trial court admitted photographs of Danny's burn, which covered a large part of his cheek and chin.

After the Department removed Zane and he tested positive for cocaine, Mother told the caseworker that the positive result occurred because he spent so much time with Father. Mother also told the caseworker her positive result occurred because she was having sex with Father. The caseworker did not believe Mother because the levels of cocaine were so high.

Mother completed a "fair" amount of services, but the caseworker thought that Mother did not benefit from the services she completed and did not implement what she was supposed to have learned. Mother attended some individual counseling but

did not complete it. Mother was uncooperative with the Department during this case. She also sent the caseworker profane text messages.

While Mother was still living in Texas, she frequently arrived late for visits with the children, cancelled at the last minute, and left early. She was unable to engage with multiple children simultaneously. Although the caseworker talked to Mother about changing diapers consistently during the two-to-four-hour visits and bringing appropriate food and snacks, Mother did not heed the caseworker's advice. However, Mother generally did well in her visits.

Zane's caseworker expressed that the Department had been concerned that when the trial court ruled in Rachel and Danny's case, Grandmother would give Rachel and Danny back to Mother without adequate transition. But she acknowledged that Mother's support system was better in Wisconsin than in Texas.

The caseworker testified about Facebook posts on Mother's page that appeared to be comments from Father after the protective order had been entered; those posts also appeared to show that Father was in Milwaukee. According to the caseworker, Father had never addressed the Department's domestic violence or drug abuse concerns.

Mother's drug-test results throughout the case were inconsistent; some were positive and some were negative. The caseworker did not think Mother's test results were consistent with someone who had gotten clean and stayed clean.

According to the caseworker, the permanency plan for Zane was adoption by his current foster placement. Zane was very bonded to Andy and his foster parents. The foster parents took good care of him and were able to provide for his needs. Zane was getting speech therapy for a speech delay, and he would need to complete those services until discharged. Zane would be able to maintain Skype contact with his older siblings.

At the time of trial, Mother was on felony probation and had a warrant out for her arrest.

### 2. Department investigator

A Department investigator assigned to Rachel and Danny's case testified that Father had a history of domestic violence in Texas and in Wisconsin. Father was at the hospital when Danny was born; he was not happy to be dealing with the investigator, and he acted as if it was Mother's sole fault that the Department was involved. The investigator testified that in 2014 Mother had gone to a shelter to escape Father but that she stayed only a week.

### 3. Adoption worker

An adoption worker assigned to Rachel and Danny's case testified that in that case, Mother had been slow to work her services. Mother told the worker that Father had been preventing her from working services.

Before Zane's birth, Mother had not been forthcoming about the fact that she was pregnant; she also tested positive for cocaine about a month before the birth.

While Rachel and Danny's case was pending, Mother left the courthouse surreptitiously one day, with the help of her attorney and the Department, and went into a shelter again for three or four months. As result, on April 11, 2016, a month before Zane's birth, Mother signed a safety plan to keep away from Father. The worker nevertheless became concerned that Mother was maintaining contact with Father after Zane's birth.

Father threatened to beat up and kill the worker. She was afraid of him.

### 4. Rachel and Danny's caseworker

Another Department caseworker testified that during Rachel and Danny's monitored return, she observed four-hour visits with them, Mother, and Zane in Mother's apartment. The house was messy, and Mother had placed a television on an upside down Rubbermaid tote. The toddler bed was broken and not put together. The worker talked to Mother about these potential hazards, and Mother fixed them. The Department helped Mother get a crib and bunkbed for the monitored return, but Mother had not used them as of March 2017.

Zane slept in a pack and play, and Danny slept in Mother's bed. Mother did not keep appointments, and without explanation she missed the day the worker had scheduled for Danny's return. The caseworker had to call Mother and remind her frequently to do things. Although Danny needed therapy for developmental delays, Mother never set it up.

In March 2017, the caseworker saw Mother in a car with Father. Father threatened this caseworker too.

### 5. Mother's probation officer

Mother's probation officer had never met Mother in person, but Mother was placed on the officer's caseload in April 2018 after a trial court ordered Mother to serve deferred-adjudication probation for felony child endangerment. Although Mother went to the probation office in person for the initial intake, that was with a different person; Mother was supposed to meet with her probation officer in April 2018 but missed the meeting. The probation officer telephoned Mother to tell her that they had to meet in Texas to get Mother's probation transferred to Wisconsin, but Mother said she could not come to Texas because of her work- and child-care obligations in Wisconsin.

Mother never got her probation transferred to Wisconsin. The probation officer did not hear from Mother until August 2018 when Mother called her to ask why a warrant had been issued for her arrest. The officer explained that because Mother had not met with her for over 90 days, the officer had filed a motion to revoke Mother's probation. The officer acknowledged that in this termination case, the trial court had signed an order allowing Mother to move to Wisconsin.

### 6. CASA volunteer

Zane's CASA volunteer testified that she had been appointed as Rachel and Danny's advocate and had continued with the family as Zane's. She had observed

Rachel and Danny's weekly visits at Mother's home during the monitored return. She described those visits as chaotic; the home was generally in disarray, and the children missed naps. The advocate suggested to Mother that she put the children down for naps during the 10:00 a.m. to 2:00 p.m. visits, but Mother would not. Sometimes, Mother left the children unsupervised for ten minutes or so. This concerned CASA because Danny was crawling, and sometimes the advocate would have to pick up small toys from the floor. The home was not childproofed for an infant. The advocate had found medications and choking hazards on the floor. During one of the visits, Mother left the children alone with the caseworker and CASA advocate to go take a bath; the oven was on. Rachel was tall enough to reach the oven and was in the kitchen trying to get water from the sink.

Before the children's removal, Zane would sleep in the bedroom most of the time during visits and was not there for some of them. After the removal, the visits in a visitation room were still chaotic. Finally, the Department asked for help from a filial therapist because Mother had a hard time watching all of the children at once. According to the CASA advocate, sometimes Mother responded to the therapist's suggestions and sometimes "it appeared as if the therapist was doing the majority of the work in the room."

The CASA advocate was at the visit when the caseworker discovered Danny's burn; they had been in the home for about five to ten minutes but Mother had not said anything.

When Zane was first in the Department's care, he was "overall" a content and happy baby, but he experienced "quite a bit of irritability." Zane appeared bonded to Mother, and he had some issues bonding to the foster mother at first. But Zane would also "address any female in the room as mom. He would walk up to them [for] whatever he needed . . . ."

The CASA advocate had no concerns about Zane's foster placement being able to meet his physical and emotional needs. The CASA advocate had not been satisfied with how Mother had responded to her older children's needs because both have cognitive and developmental delays, and she did not obtain the services she was supposed to obtain when they were on a monitored return.

The CASA advocate was concerned about Father because he had not participated in Zane's case at all, had not attempted to visit Zane or work services, and had a history of drug use and domestic violence. CASA supported termination of Mother's rights because its concerns leading to the removal had not been mitigated, specifically Mother's drug use, her life choices, the history of domestic violence, and CASA's opinion that Zane had not been getting the cognitive intervention he needed. But the advocate did not explain what she meant by cognitive intervention.

The CASA advocate acknowledged that the last known incident of domestic violence between Mother and Father occurred in fall 2016. Likewise, she did not know for sure if Mother and Father had been in contact since 2017. But she thought from looking at Facebook that Father had been in Milwaukee in April 2018.

24

According to the CASA advocate, in the ten months before trial, she had seen nothing positive or negative regarding Mother and Zane because Mother would not speak with her or provide her with proof of employment: "After three years of receiving resources for her CPS cases, she would need to demonstrate more than just a temporary or short time or short-term rehabilitation in the process. Changes, life choices, positive life choices."

The CASA advocate thought Zane and Andy were very bonded. Zane incorporated Andy into their floor play, entertained him, and played with toys with him. She thought their emotional and social bond kept them stabilized.

### 7. Filial therapist

The filial therapist began working with Mother in August 2016, and she worked with her for six sessions. The therapist's main goal was to have Rachel respond better to Mother's authority because Rachel had been having issues with her then foster mother. After six weeks, the therapist decided that filial therapy was not right for the family because Mother "was still adjusting to just managing her household more than being able to accomplish filial goals." Mother needed to prepare more for getting her home ready for Rachel and Danny's monitored return. At the time, Mother did not have adequate food in the refrigerator for a child or adult and did not implement the tools and ideas the therapist gave her.

The therapist noted that the home had hazardous and distracting debris on the floor. Additionally, she "observed almost an assumption that [Rachel] could take care

25

of some things while [Mother] went and did something else that wasn't age appropriate." Thus, Mother needed to take care of basic parenting and safety issues before she could move on to filial therapy.

The therapist opined that Zane should have a relationship and contact with his older siblings and that Zane and Andy's foster mother had indicated she wanted that to happen. Because Zane did not know his older siblings very well, that relationship would need to be developed.

Rachel had experienced some school issues when the filial therapist worked with the family: aggression, hitting, and misbehaving at school and the foster home. But the therapist recognized those could have occurred because Rachel had been removed from Mother's care.

Mother seemed to want her children back, and she needed help. The therapist did not see improvement over the six sessions, and she did not think Mother's home or supervision was safe. But Mother loved and cared for Zane as an infant appropriately.

**8. Foster mother**

Zane had been in the foster parents' home for ten months; Andy lived with them as well. Zane was doing very well and had no medical needs. Once a month, he had speech therapy. Mother Skyped with Zane and Andy three times a week for fifteen minutes at a time. Mother initiated the calls. During one of the calls, Foster Mother overheard Mother talking to an unseen man she called Boo. Additionally,

Foster Mother had seen Mother twice with a black eye. On June 14, 2018,[11] Mother had initially been wearing sunglasses during the call while inside her apartment. When she took off the glasses, Foster Mother saw the black eye. Foster Mother also saw Mother with a black eye on July 3, 2018.

Foster Mother felt bonded to Zane; he and Andy had been together in her home for over six months. She and her husband intended to adopt Zane.

### 9. Mother

Mother denied being a drug addict but admitted she had used cocaine in 2015 while she was pregnant with Danny; she had been coping with having lost another baby. According to Mother, she used cocaine for about a year. She did not consider herself an addict because she no longer used drugs. Her sobriety date was in July or August of 2015. Mother did not believe she needed to attend AA or NA. She said she had been able to stop taking drugs on her own without treatment. Mother stayed clean by trying to live positively; she did not identify any tools she used to maintain sobriety because she was not stressed.

Mother testified that she became involved with Father about a year before Danny's birth; she claimed at trial that he was not Rachel's father although he is named as Rachel's alleged father in the court orders. Mother got pregnant with Danny while in Wisconsin; she claimed that although Father was present for Danny's birth,

---

[11]Mother's Skype calls had been very consistent before the June 14 call; on June 12, Mother cancelled the scheduled call at the last minute without explanation.

he knew he might not be Danny's father as well. Mother described her relationship with Father as "on and off."

Mother testified that she continued a relationship with Father after going to the shelter in 2016 because she thought he had changed although he had not started any services or done any of his drug treatment. Mother thought she tested positive for cocaine in April 2017 by having sex with and touching Father about once per week. Mother knew Father was not supposed to have contact with Rachel and Danny but thought he could have contact with Zane because he was his father. She never thought about what she could have done to protect Zane even though she had a lawyer at the time for Rachel and Danny's case.

Mother explained why she would no longer go back to a relationship with Father:

> Ever since I left to go to Wisconsin, I've just been at peace. I'm just -- I can't explain it. I'm just at a better place. I'm content with being by myself. Well, I'm not really by myself. I really don't need a man with me. But I'm just content with just me and my children. And I wish I would have made this decision a long time ago.

When asked what would prevent them from getting back together, Mother said, "I doubt . . . that'll happen."

Mother explained that Father has another child with a woman who lives in Wisconsin. Mother and Father are from the same area in Wisconsin, and she continues to associate with his family. But she said the last time she saw Father was in September 2017.

Mother could not figure out how she was testing positive for drugs after 2015 because she was not using. She stated that her hair has never grown quickly, and she has stress spots and sometimes bald spots in her hair. Other than physical contact, she thought maybe it was just hard to get the drugs out of her hair because it grows so slowly. Mother also did not know why her December 2017 drug-test result was positive because she was not having sex with Father at that time. She opined that the test result was wrong and could have been from drugs she had been given in the hospital nine months earlier. But Mother admitted she had not been given cocaine in the hospital.

Mother said she felt like her children's testing positive for drugs was her fault but also not her fault because "I don't use drugs." She denied knowing that Father was using drugs around April 2017.

Grandmother returned Rachel and Danny to Mother in April 2018 soon after Mother had returned to Wisconsin. Mother was aware at the time that the Department was under the impression that Rachel and Danny would live with Grandmother while Mother had transition visits, but Mother and Grandmother decided that the children could be with Mother because she "wanted to see [her] kids."

Mother explained that she did not let CASA and the Department's caseworker into her apartment in Wisconsin because she was getting the children ready. She said

she was not trying to avoid the surprise Wisconsin apartment visit; she just needed to visit her friend who was in the hospital with kidney stones.

Mother admitted that her Wisconsin apartment had a broken window that had been that way since she moved in. But she said the window is double paned and is only broken on the outside. According to Mother, the landlord knew about it and said he had to order a new window. Although Mother had the financial means to take care of the window herself, she did not want to.

Mother was not concerned with her Texas probation because "[t]he judge signed off that [she could] do [her] probation in Wisconsin." She agreed she had not complied with the probation conditions, nor had she adhered to the procedure to transfer her probation to Wisconsin. Mother said that she tried to contact the probation department in Wisconsin in August 2018, but she was confused and did not know where to start. Mother did not know the potential punishment range if her probation were to be revoked, and she did not have a plan for if she were incarcerated.

Mother testified that she had maintained a job in Wisconsin for three to four months before trial. Rachel and Danny were in school during the day. She was doing a good job as a mother and was more organized. Grandmother was her support system and assisted with Danny and Rachel's care.

Mother communicated with Zane and Andy by Skype three times per week, but she could not visit Texas because of her work. Mother thought that during the Skype

visits, she got more attention from Andy than Zane. Zane just wanted to talk to Rachel, and according to Mother, his relationship with Rachel was better than his relationship with her. Mother denied having a black eye during any calls; she said she wears mink eyelashes and had an allergic reaction one day that made her eyes puffy. She admitted wearing sunglasses that day.

Mother agreed that Father should not be around any of the children.

Before trial, Mother had been contacted by child protective services in Wisconsin about suspected physical abuse of Danny by an unidentified person. When asked if that person was a man, Mother said, "I'm not sure."

## C. Analysis

The evidence is legally and factually sufficient to support the trial court's termination finding. The trial court was not obligated to believe Mother's explanations for her positive drug-test results, which were not the only endangering behavior in which Mother had engaged. Before Zane's removal, Mother allowed Father regular contact with Zane and demonstrated a lack of ability to supervise all of her children together. Mother had no concrete plan for staying away from Father or other potentially abusive relationships or for staying off drugs. The Department had plans for Zane to be adopted by a family he was bonded to and who cared for him. The Department acknowledged the importance of maintaining contact between Zane and his older siblings. Although Mother said she had improved her life choices and parenting abilities, the Department could not verify whether this was true because

31

Mother moved to Wisconsin and had been uncooperative in looking for services there. Although Mother was facing incarceration, she did not take responsibility for transferring her probation to Wisconsin.

Thus, the evidence shows that Mother had not adequately addressed the issues leading to Zane's removal—impacting her ability to meet his needs and keep him safe—and that the Department had firm plans for Zane that would maintain stability and safety in his life. We hold that the evidence is both legally and factually sufficient to support the trial court's best-interest finding. We overrule Mother's second issue.

## V.    Conclusion

Because we have overruled Mother's two issues on appeal, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: April 18, 2019